James T. MARTIN, Jr.

v.

**D.C. METROPOLITAN POLICE DEPARTMENT, et al., Richard Xander, et al., Appellants.**

James T. MARTIN, Jr.

v.

**D.C. METROPOLITAN POLICE DEPARTMENT, et al., Richard Xander, et al., Appellants.**

Nos. 85–6071, 85–6072.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 1986.

Decided Feb. 10, 1987.

Rehearing En Banc Granted May 8, 1987.*

* Section IV and the dissenting opinion were vacated.  See 817 F.2d 144.

John D. Bates, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

Kerry W. Kircher, with whom James E. Coleman, Jr., Washington, D.C., was on the brief, for appellee.

Before EDWARDS, GINSBURG and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Concurring opinion filed by Circuit Judge EDWARDS.

Opinion concurring in part and dissenting in part filed by Circuit Judge STARR.

RUTH BADER GINSBURG, Circuit Judge:

This case concerns the "absolute" immunity of federal law enforcement officers from common law tort liability, and their "qualified" immunity from "constitutional tort" liability. In a civil action for compensatory and punitive damages, plaintiff-appellee James T. Martin charged officers of the United States Capitol Police [1] with malicious prosecution, abuse of process, and violation of rights guaranteed him under the fifth amendment to the United States Constitution.[2] The federal officers moved to dismiss Martin's claims on immunity grounds. Citing *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), the officers asserted absolute immunity from suit on Martin's common law claims; featuring *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), they asserted qualified immunity from suit for constitutional torts. The district court denied the officers' threshold, immunity-based dismissal motions and ordered the parties to proceed with discovery.[3]

We hold that Martin's common law tort claims must be dismissed because the federal officers legitimately asserted absolute immunity and were not tenably charged with action beyond the outer perimeter of their law enforcement responsibilities. We remand Martin's constitutional claims for reconsideration in light of the pleading directions for qualified immunity cases indicated in *Hobson v. Wilson*, 737 F.2d 1 (D.C.

---

**1.** Defendant Richard Xander is employed by the District of Columbia Metropolitan Police Department; at all times relevant to this litigation, Xander was "on detail" to the U.S. Capitol Police. *See* Xander Affidavit at 1, Joint Appendix (J.A.) at 81.

**2.** Amended Complaint at 8–11, J.A. at 33–36.

**3.** The district court stayed discovery, first pending resolution of the defendants' motions, *see* J.A. at 46, and again pending this appeal. J.A. at 107.

Cir.1984), *cert. denied sub nom.* *Brennan v. Hobson,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), and in this opinion.

## I.

On November 27, 1982, the Ku Klux Klan held a march in Washington, D.C. The event attracted public controversy and media attention. Plaintiff Martin became a figure in the day's incidents. As Martin alleged in the instant litigation, local and national news media captured on film an assault on him by District of Columbia Metropolitan Police Department (MPD) officers wherein Martin was "shoved ... through a plate glass window [and beaten] with nightsticks about the head, shoulders, and arms." [4] Martin does not claim that any of the present defendants, all U.S. Capitol Police officers, participated in the November 27, 1982 incident. He does assert, however, that after photographs of the MPD officers' assault were broadcast, various MPD officers and the Capitol Police defendants "conspired to develop an unlawful scheme to deflect attention from their actions and to deter plaintiff from seeking to vindicate the violation of his rights." [5] Allegedly in furtherance of this scheme, Capitol Police officers arrested Martin and charged him with burglary, destruction of a police cruiser and theft of police property; he was subsequently acquitted of the latter two offenses and convicted, at his trial for burglary, of the lesser included offense of unlawful entry.

On February 21, 1985, Martin commenced this action. His suit in the district court included in the array of defendants the District of Columbia, MPD officers alleged to have participated in the assault or its aftermath, and Capitol Police officers alleged to have conspired with MPD officers to impede Martin's access to justice. While the instant appeal was *sub judice,* Martin reached a settlement with the District of Columbia and the MPD defendants, and all claims against those defendants have been voluntarily dismissed.

The federal officer (Capitol Police) defendants had promptly moved in the district court for dismissal of all claims asserted against them. First confronting the common law tort claims, the Capitol Police officers cited *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), as the pathmarking precedent establishing their absolute immunity. The district judge denied the officers' request for instant dismissal of the common law tort claims. She pointed to Martin's allegations that the federal defendants had "exceeded their authority by conspiring to violate the plaintiff's rights," [6] and had "resorted to 'manifestly excessive means' to achieve their objectives." [7] The court further remarked that "at this early stage, dismissal or summary judgment is plainly inappropriate"; "[h]aving asserted a claim that could potentially defeat the defendants' immunity claim, the plaintiff is entitled to conduct discovery to determine if an issue of material fact exists." [8]

The Capitol Police officers also failed to gain early dismissal of Martin's claims of constitutional violations. Their plea to this branch of the complaint was qualified immunity. The district court stated that qualified immunity exonerates federal officials only when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Martin's allegations of "a police conspiracy whose aim was to deter plaintiff from seeking to vindicate his legal rights," taken as true for purposes of ruling on defendants' motion for summary judgment, indicated the deprivation of two clearly established constitutional rights: the right of access to the

---

4. Amended Complaint ¶ 13, J.A. at 30.

5. *Id.* at ¶ 18, J.A. at 31.

6. Memorandum Order, C.A. No. 85–0624, at 12 (D.D.C. July 22, 1985), J.A. at 24.

7. Memorandum Order, C.A. No. 85–0624, at 5 (D.D.C. Sept. 25, 1985) (quoting Mcwrnney v. Whitfield, 736 F.2d 766, 770 (D.C.Cir.1984)), J.A. at 59.

8. *Id.* at 6, J.A. at 60 (citation omitted).

courts and due process.[9] When the law in question is clearly established, the district court observed citing this court's words, "the Government actor is presumed to have known about it [and] summary judgment in his favor must be denied." *Hobson*, 737 F.2d at 25. The Capitol Police officer defendants, by this appeal, seek reversal of the district court's rulings refusing to dismiss the action in response to the officers' pleas of absolute and qualified immunity.[10]

## II.

All parties, and the district court, agreed that if the Capitol Police were engaged in discretionary activity within the "outer perimeter of their line of duty," then plaintiff's common law claims for malicious prosecution and abuse of process would be barred by the doctrine of absolute immunity. *See Barr*, 360 U.S. at 575, 79 S.Ct. at 1341; *McKinney v. Whitfield*, 736 F.2d 766, 768–69 (D.C.Cir.1984).[11]

The district court, in refusing to dismiss the common law claims, emphasized Martin's allegations of an unlawful conspiracy among the federal and municipal defendants. The conspiracy theory, the court thought, placed the federal officers' conduct beyond the pale or "outer perimeter" of their authority, and thus let down the absolute immunity bar. In its initial order denying summary adjudication, the court stated: "[T]he plaintiff has clearly alleged that the federal defendants exceeded their authority by conspiring to violate the plaintiff's rights." [12] In response to the defendants' renewed motion, the court further commented: "[T]he conspiracy allegations brought against the federal defendants, if true, constitute acts that fail to satisfy the 'functional' test set out in *McKinney*" insofar as the "immunity's justifying purpose [which] may best be defined as 'the effective functioning of government' [is not] 'related closely' to an alleged conspiracy to deprive an individual of basic consti-

9. Memorandum Order, C.A. No. 85–0624, at 6–7 (D.D.C. Oct. 31, 1985), J.A. at 102–03.

10. Denial of a claim of absolute immunity is immediately appealable under the "collateral order" doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). *See Nixon v. Fitzgerald*, 457 U.S. 731, 742–43, 102 S.Ct. 2690, 2697, 73 L.Ed.2d 349 (1982). Denial of a qualified immunity claim is similarly appealable at once. *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2815–17, 86 L.Ed.2d 411 (1985).

11. As we observed in *McKinney*, courts have "extended the absolute immunity defense to 'executive officials at all levels' of the federal hierarchy" and to "a full range of common law delicts." *McKinney*, 736 F.2d at 768–69, quoting *Expeditions Unlimited Aquatic Enterprises v. Smithsonian Institution*, 566 F.2d 289, 307 (D.C.Cir.1977) (Wilkey, J., concurring), *cert. denied*, 438 U.S. 915 (1978); *see also Butz v. Economou*, 438 U.S. 478, 494–95, 98 S.Ct. 2894, 2904–05, 57 L.Ed.2d 895 (1978) (federal officials entitled to absolute immunity from "state tort claims").

The distinction indicated (but not explained) in *Butz* between a federal official's absolute immunity from common law claims and qualified immunity from constitutional claims has not been universally well-received. *See, e.g., Queen v. Tennessee Valley Authority*, 689 F.2d 80, 87 (6th Cir.1982) (Merritt, J., dissenting), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d

344 (1983); *Morinville v. Old Colony Cooperative Bank*, 579 F.Supp. 1498, 1502–03 (D.R.I.1984); 5 DAVIS, ADMINISTRATIVE LAW TREATISE 116–17 (2d ed. 1984); SCHUCK, SUING GOVERNMENT 89–92 (1983). We think it irrational for a federal court to shield a federal official more broadly than the court would shield "his state or territorial brother similarly situated." *Carter v. Carlson*, 447 F.2d 358, 371 (D.C.Cir.1971) (Nichols, J., concurring), *rev'd on other grounds sub nom. District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973); *cf. Harlow v. Fitzgerald*, 457 U.S. 800, 818 n. 30, 102 S.Ct. 2727, 2738 n. 30, 73 L.Ed.2d 396 (1982). We do not, however, confront that situation here; while state law enforcement officers generally have been accorded only a qualified immunity from suits alleging false imprisonment, *see Pierson v. Ray*, 386 U.S. 547, 555–57, 87 S.Ct. 1213, 1218–19, 18 L.Ed.2d 288 (1967); *Carter*, 447 F.2d at 361–65, absolute immunity is the general common law rule where malicious prosecution is alleged. *Cooper v. O'Connor*, 99 F.2d 135, 137–42 (D.C. Cir.), *cert. denied*, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414 (1938); *see Laughlin v. Garnett*, 138 F.2d 931, 931 (D.C.Cir.1943), *cert. denied*, 322 U.S. 738, 64 S.Ct. 1055, 88 L.Ed. 1572 (1944). *See generally White v. Towers*, 37 Cal.2d 727, 730–33, 235 P.2d 209, 211–14 (1951) (reviewing cases); Annot., Civil Liability of Law Enforcement Officers for Malicious Prosecution, 28 A.L. R.2d 646, 649–51 (1953).

12. Memorandum Order, C.A. No. 85–0624, at 12 (D.D.C. July 22, 1985), J.A. at 24.

tutional rights." [13] We find the conspiracy theory inadequate to overcome the absolute immunity defense; we set out our reasoning below.

No government officer, of course, can be "authorized" to act unlawfully. But if the scope of an official's authority or line of duty were viewed as coextensive with the official's lawful conduct, then immunity would be available only where it is not needed; in effect, the immunity doctrine would be "completely abrogate[d]." *Briggs v. Goodwin*, 569 F.2d 10, 15 (D.C. Cir.1977), cert. denied, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); *see also Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949) (proper inquiry is whether "the occasion [was] such as *would have* justified the act, *if* [the defendant] had been using his power for any of the purposes on whose account it was vested in him") (emphasis added), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

■ The core of Martin's complaint in this case, before one can reach his conspiracy theory, is that the defendants were animated by improper motives in deciding to pursue his arrest and indictment. While such official pursuit of an individual may indeed invade a recognized legal interest, we stress that the pursuer would not on that account lose his absolute immunity from common law tort liability, for immunity of the absolute kind adheres "even when the [officer] is accused of acting maliciously and corruptly." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967); *see also Barr*, 360 U.S. at 575, 79 S.Ct. at 1341. So long as the officer "performed the kind of act not 'manifestly or palpably beyond his authority,' but rather 'having more or less connection with the general matters committed by

law to his control or supervision,' " *Briggs*, 569 F.2d at 11–16, quoting *Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896), absolute immunity clings to the officer's actions. *Cf. Imbler v. Pachtman*, 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1976) (distinguishing the significance of the defendant's motivations in the absolute and qualified immunity contexts). The only overt acts in which the defendants are alleged to have engaged are squarely within both the statutory authority conferred on the U.S. Capitol Police, *see* 40 U.S.C. § 212a (1982), and the general ambit of law enforcement duties, *i.e.*, participating in the decision to initiate criminal proceedings, and swearing out and executing an arrest warrant.[14]

■ Martin's conspiracy allegations cannot change the analysis, for "[a]ccusing [the defendants] jointly, or by way of a count in conspiracy, gives [plaintiff's] case no more virtue than if he had proceeded against each [defendant] singly." *Cooper v. O'Connor*, 99 F.2d 135, 142 (D.C.Cir.), cert. denied, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414 (1938). The essence of a conspiracy is an agreement to perform an unlawful act. Eliminating consideration of motive, as the *Barr* line of cases does, it is hardly unlawful for federal and municipal police officers to agree to pursue in concert lawful means of apprehending a suspect; such an agreement surely would not fall outside the scope of defendants' general law enforcement duties. *See id.* at 143 (officers' "combining to perform [law enforcement] acts was lawful, [and] so long as each is proceeding within the scope of his official duties" plaintiff's suit is barred).[15]

---

**13.** Memorandum Order, C.A. No. 85–0624, at 4 (D.D.C. Sept. 25, 1985), J.A. at 58.

**14.** *See* Amended Complaint, ¶ 7, 9–10, 25–27, J.A. at 29–33.

**15.** Martin argues that "[i]t is one thing to say that a police officer who engages in otherwise proper activities for an improper purpose is immune from common law tort liability. It is quite another to suggest that two or more officers may conspire together for an unlawful pur-

pose and still obtain immunity." Brief of Appellee at 15 n. 15. Our *Cooper* precedent, however, does indeed suggest that one of these things *is* like the other. The distinction Martin proposes, moreover, would open the door to artful pleading of conspiracy as a means to circumvent the immunity bar. Furthermore, we see no logical justification for treating differently an agreement to perform acts to which absolute immunity attaches, on the one hand, and the individual acts themselves, on the other hand, absent

The district court stressed the "formative stage" of the proceedings in denying the defendants' dispositive motions:

> Discovery has not yet begun, and thus it is not yet clear whether evidence exists to support the plaintiff's allegations.... [A]t this early stage, dismissal or summary judgment is plainly inappropriate. Having asserted a claim that could potentially defeat the defendants' immunity claim, the plaintiff is entitled to conduct discovery to determine if an issue of material fact exists.

Memorandum Order, Civil Action No. 85-0624, at 5–6 (D.D.C. Sept. 25, 1985), J.A. at 59–60. We think the "sue now, discover if you have a claim later," approach is particularly inappropriate in the context at hand.

■ Allowing discovery to proceed so as to enable Martin to establish *"whether* evidence exists to support" his allegation and *"if* an issue of material fact exists" is not the "firm application" of Rules 12 and 56 the Supreme Court envisioned in cases of this kind. *See Butz,* 438 U.S. at 508, 98 S.Ct. at 2911. Discovery is itself one of the burdens from which defendants are sheltered by the immunity doctrine. *See Mitchell,* 105 S.Ct. at 2815 (absolute immunity is not "a mere defense to liability"; its "essence" is "its possessor's entitlement not to have to ... stand trial *or face the other burdens of litigation* ") (emphasis added); *Elliott v. Perez,* 751 F.2d 1472, 1478 (5th Cir.1985) ("subjecting officials to trial, traditional discovery, or both concerning acts for which they are likely immune undercuts the protection from governmental disruption which official immunity is purposed to afford"); *cf. Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736 ("social costs"

against which immunity guards "include the expenses of litigation [and] the diversion of official energy from pressing public issues").

Plaintiff's burden, when confronted with a properly supported summary judgment motion, is to "set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (emphasis added). A plaintiff's hope that further evidence may develop prior to trial is an "insufficient basis upon which to justify the denial of [defendants'] motion." *Contemporary Missions, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981). This general rule bears particularly firm application in the immunity context in light of the policy basis for shielding public officials from civil suit. Plaintiff Martin has come forward with no specific facts to suggest that defendants, if one does not inquire into their motives, were acting outside the scope of their authorized responsibilities. *See Morrison v. City of Baton Rouge,* 761 F.2d 242, 248 (5th Cir. 1985). And motive inquiry, as we earlier observed, is incompatible with *Barr* -style absolute immunity.

In sum, the record now stands without "evidence from which reasonably minded jurors might draw an inference" that defendants' actions were unprotected by the absolute shield doctrine in point. *See Anderson,* 106 S.Ct. at 2510. Martin has proffered no such evidence, nor has he even hinted at what such evidence might be. Therefore, defendants' motion for summary judgment dismissing Martin's common law claims must be granted.[16]

---

reason to believe that the very agreement (once more, leaving aside what motivated it) was somehow unauthorized.

**16.** As an additional ground for refusing to dismiss the common law claims, the district court observed: "[P]laintiff's claims clearly imply that the defendants resorted to 'manifestly excessive means' to achieve their objectives." Order, Sept. 25, 1986, J.A. at 59 (quoting *McKinney,* 736 F.2d at 770).

We are uncertain what "means" the district court had in view. In *McKinney,* the defendant supervisor had used unauthorized means—phys-

ical force—to achieve an otherwise authorized objective. We held that the supervisor forfeited his absolute immunity pro tanto; the employee allegedly hurt by the use of force could sue for assault and battery. *Id.* at 769, 771; *see also Bishop v. Tice,* 622 F.2d 349 (8th Cir.1980). In the instant case, the district court apparently thought that the alleged conspiracy among defendants constituted "excessive means" within the meaning of *McKinney.* Our *McKinney* decision does not bear so broad a construction. In contrast to the literal arm twisting alleged as the improper means in *McKinney,* coordinating federal and local police efforts to arrest and prose-

## III.

As earlier indicated, we follow the route traveled by the parties and the district court in approaching Martin's common law tort claims under an "absolute immunity" rubric, and his constitutional tort claims under a "qualified immunity" headline. If the double standard is problematic, *see* 5 K. DAVIS, ADMINISTRATIVE LAW TREATISE 97–100, 109–36 (2d ed. 1984), it is nonetheless the framework High Court precedent currently delineates. *See Harlow; Butz,* 438 U.S. at 494–98, 98 S.Ct. at 2904–06. Having set out above our analysis of the common law tort/absolute immunity facet of this case, we turn now to the question whether the Capitol Police officers are entitled to summary judgment on their qualified immunity defense to Martin's Constitution-based claims.

Martin alleges, in substance, that the decision to arrest and prosecute him, in which the Capitol Police officers participated, was calculated to stop him from vindicating his legal rights. In particular, he asserts that federal and District police force members sought to impede his access to court to recover for his mistreatment by MPD officers on the Klan march day, November 27, 1982. If his allegations are true, he has indeed suffered an injury of constitutional dimension. *See, e.g., United States v. Goodwin,* 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982) ("[it is] 'patently unconstitutional' [for an official] to pursue a course of action whose objective is to penalize a person's reliance on his legal rights") (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663,

668, 54 L.Ed.2d 604 (1978)); *Silver v. Cormier,* 529 F.2d 161, 163 (10th Cir.1976) (right of access to courts is guaranteed by due process clause; official's action designed to impede that right is actionable under 42 U.S.C. § 1983); *Dellums v. Powell,* 490 F.Supp. 70, 74 (D.D.C.1980), *aff'd,* 660 F.2d 802 (D.C.Cir.1981) (allegation of malicious prosecution undertaken for express purpose of coercing plaintiffs to refrain from exercising constitutional rights states *Bivens*-type claim); *Jennings v. Shuman,* 567 F.2d 1213, 1220 (3d Cir.1977) (malicious abuse of process is "by definition" a denial of due process).

For constitutional claims of the kind Martin has attempted to state, the official actor's intent, motive, or purpose is the critical element. Defendants in this case are quite right when they describe Martin's charge that the Capitol Police "acted unlawfully" as "coextensive with [Martin's] allegation of unconstitutional motive, for ... only a bad motive ... could transform [defendants'] otherwise objectively lawful conduct [*i.e.,* their participation in arresting and initiating criminal proceedings against Martin] into unlawful conduct." Brief of Appellants at 27 n. 11. We do not agree with defendants' further position, however, that under the *Harlow* decision now guiding the qualified immunity inquiry, as under *Barr*-style absolute immunity, an official's state of mind is *never* relevant, so that Martin is totally disarmed and the Capitol Police must prevail based simply and solely on the "objective reasonableness" of their conduct.

cute persons in the District of Columbia is not an objectively identifiable impermissible mode of behavior.

Another possible interpretation of the district court's position—that the defendants' allegedly improper motives constitute "excessive means"—is similarly infirm. Such an interpretation would subvert the protection afforded even improperly motivated actions by the absolute immunity doctrine. *McKinney* homed in on directly observable behavior—physical force visited on desk employees by supervisors. The opinion in no way suggests the propriety of a state of mind inquiry to defeat an absolute immunity claim.

Martin's assertion that he was "arrested by an abnormally large and complex team of officers

... even though [he] had only one prior criminal conviction ... and was charged with a relatively minor offense not involving physical violence," Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 10, comes closer to the *McKinney* mark. However, not only did plaintiff fail to provide factual support for his claim that the arresting team was "abnormally large and complex," he failed to demonstrate a sufficient nexus between the allegedly excessive means and his common law claims. Even if the arresting officers forfeited their immunity with respect to "th[at] specific conduct," *see McKinney,* 736 F.2d at 770, the charge that the arrest force was undue does not tightly relate to Martin's claims of malicious prosecution and abuse of process.

Defendants' position exposes a fault or vulnerability in the current law of qualified immunity. We explain the problem as we see it. The Supreme Court in *Harlow* held that "government officials performing discretionary functions, generally are shielded from liability for civil damages *insofar as their conduct does not violate clearly established rights* of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738 (emphasis added); *see also Davis v. Scherer,* 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984) ("Whether an official may prevail in this qualified immunity defense depends upon the 'objective reasonableness of [his] conduct as measured by reference to clearly established law.' No other 'circumstances' are relevant to this issue of qualified immunity.") (footnotes omitted); *Mitchell,* 105 S.Ct. at 2816 (defendant entitled to dismissal on qualified immunity plea unless plaintiff states a claim of violation of clearly established law). The district judge in the instant case, endeavoring to heed the High Court's instruction, observed that the constitutional rights in question had "been established by case precedent for years"; consequently, she denied defendants' motions for summary judgment.

A reasonable law enforcement officer would surely know that an arrest or prosecution undertaken to deter an individual from pursuing bona fide civil claims would trample upon clearly established constitutional rights. Defendants do not suggest otherwise. Their focus is not on *Harlow*'s "conduct ... violat[ing] clearly established ... rights" reference. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Instead, they underscore *Harlow*'s concern to confine court examination to "the objective reasonableness of an official's conduct." *See id.; see also Davis,* 104 S.Ct. at 3018 ("*Harlow* ... rejected the inquiry into state of mind in favor of a *wholly objective standard*") (emphasis added); *Mitchell,* 105 S.Ct. at 2811 ("*Harlow* ... purged qualified immunity doctrine of its subjective components"). Martin has advanced only "bare allegations of malice," defendants say, and *Harlow* instructs that such undocumented assertions "should not suf-

fice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2738.

The "clearly established law" and "objective reasonableness" facets of current qualified immunity doctrine tug in opposite directions where, as here, the "clearly established law" itself contains a subjective component. If *Harlow* and progeny do not ever permit inquiry into a government official's state of mind, defendants' motion must be granted forthwith, for in Martin's case, absent unconstitutional motive for the plaintiff's arrest and prosecution, no clearly established law has been violated. We do not think, however, that the *Harlow* decisional line reaches that far.

*Harlow* involved plaintiff Fitzgerald's allegation that, in violation of his rights under the first amendment, he had been dismissed in "retaliation for his truthful testimony before a congressional Committee." *Nixon v. Fitzgerald,* 457 U.S. 731, 736, 740, 102 S.Ct. 2690, 2694, 2696, 73 L.Ed.2d 349 (1982). The substantive law governing that claim required Fitzgerald to establish that his protected speech was a "substantial or motivating factor" in his dismissal. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Had the Court intended its formulation of the qualified immunity defense to foreclose *all* inquiry into the defendants' state of mind, the Court might have instructed the entry of judgment for defendants Harlow and Butterfield on the constitutional claim without further ado. In fact, the Court returned the case to the district court in an open-ended remand, a disposition hardly consistent with a firm intent to delete the state of mind inquiry from every constitutional tort calculus.

Our recent decision in *Hobson v. Wilson,* 737 F.2d 1, 29–31 (D.C.Cir.1984), devotes some pages to the topic "Pleading Unconstitutional Motive." Our endeavor in *Hobson* to specify pleading requirements for cases involving allegations of unconstitutional motive is at odds with the "state-of-

mind-is-never-relevant" interpretation of the qualified immunity doctrine.

█ *Hobson* implicitly recognized that the "motive never counts" interpretation would radically alter the existing balance with respect to claims of constitutional deprivations. In effect, the alteration would insulate officials from liability in all cases in which the substantive prescription makes the official's state of mind an essential component of the alleged constitutional violation.[17] So major a change, we believe, should not be embraced in the absence of unambiguous instructions from the High Court. *Accord Kenyatta v. Moore,* 744 F.2d 1179, 1185 (5th Cir.1984) (*Harlow* "did not entirely eliminate subjective inquiry from every qualified immunity analysis"), *cert. denied,* 471 U.S. 1066, 105 S.Ct. 2141, 85 L.Ed.2d 498 (1985); *Harris v. Eichbaum,* 642 F.Supp. 1056, 1065 (D.Md.1986) ("To completely foreclose any inquiry into the officials' subjective motivation in such cases would unfairly deprive potential victims of constitutional abuses of a remedy in a manner which this court is of the opinion the *Harlow* Court did not intend."). *See also Halperin v. Kissinger,* 807 F.2d 180, 186 (D.C.Cir.1986) (restating this circuit's position that subjective inquiry is not proscribed where plaintiff's claim, as here, rests upon the "presence of an invalidating intent unrelated to knowledge of the law (*e.g.,* racial or political antagonism)"). We

adhere to *Hobson,* and hold that when the governing precedent identifies the defendant's intent (unrelated to knowledge of the law) as an essential element of plaintiff's constitutional claim, *see Halperin,* 807 F.2d at 185–87, the plaintiff must be afforded an opportunity to overcome an asserted immunity with an offer of proof of the defendant's alleged unconstitutional purpose.[18]

At the same time, we do not lose sight of the goal the *Harlow* Court had in view when it set an objective standard in the qualified immunity context. That prime goal is the prompt termination of vexatious litigation against public officials. *Harlow,* 457 U.S. at 815–16, 102 S.Ct. at 2736–37. Mindful of *Harlow*'s rationale, we attempted in *Hobson* to strike a fair balance between 1) the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority," *Butz,* 438 U.S. at 506, 98 S.Ct. at 2911, and 2) the countervailing need to provide a "realistic avenue for vindication of constitutional guarantees." *Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736. The instant case illustrates the difficulties trial courts may encounter in grappling with appellate opinions on slippery subjects. Aware that our abstract statements, like the Supreme Court's, sometimes elude concrete application, we next essay further amplification and clarification.

**17.** A government official's motive or purpose is often an essential element of plaintiff's *prima facie* constitutional claim. *See, e.g., Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) (discriminatory intent required to establish violation of equal protection guarantee); *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("deliberate indifference" required to show violation of prohibition against cruel and unusual punishment); *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985) (selective prosecution claim must be supported by evidence of discriminatory purpose). *See generally Note, Qualified Immunity for Government Officials: The Problem of Unconstitutional Purpose in Civil Rights Litigation,* 95 YALE L.J. 126, 134–36 (1985); Kirkpatrick, *Defining a Constitutional Tort Under Section 1983: The State-of-Mind Requirement,* 46 U. CIN.L.REV. 45 (1977). In the words of one court:

[A] police officer does not violate a citizen's constitutional rights by accidentally running

into him on the street ... unless that police officer was trying to prevent the citizen from arriving at the polls to vote.... If the officer accidentally ran into a march of peaceful protestors, mangling and killing several, his careless driving alone would amount to no more than a State tort.... If, however, he swerved to frighten the protestors, of whom he disapproved, his accidental bruising of even one makes out a First Amendment violation under [42 U.S.C.] § 1983, being the natural result of an unconstitutional intent.

*Dandridge v. Police Dep't of Richmond,* 566 F.Supp. 152, 160–61 (E.D.Va.1983) (citations omitted).

**18.** We emphasize that this holding applies only to instances in which the controlling substantive law makes the official's state of mind an essential element of plaintiff's constitutional claim. Where that is not the case, *Harlow* should rule out subjective inquiry.

**1434**

### IV.**

In *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986), the Supreme Court emphasized that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" (quoting FED.R.CIV.P. 1). *Accord Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As *Catrett* and *Anderson* clarify, it is not the moving party's burden to disprove unsupported claims of his opponent; that consideration has added force when, as in the area of concern in this case, the reasons for swiftly terminating insubstantial lawsuits are particularly strong. *See Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736.

■ Defendants here, we think it safe to conclude, have said and produced enough in the first instance to cross into summary

** Section IV was vacated on grant of rehearing en banc.

judgment territory.[19] By affidavit, the Capitol Police officers have attested to their good faith. They have shown, in support of the "objective reasonableness" of their conduct, the at least arguable existence of probable cause to arrest Martin, and they have cited in corroboration Martin's subsequent indictment and conviction.[20] We therefore turn our attention to plaintiff's side. In response to defendants' *prima facie* showing of entitlement to qualified immunity, has Martin demonstrated, or should he be accorded further opportunity to demonstrate, the existence of a "genuine issue of material fact"?

As *Hobson* indicated, plaintiffs must "produce some factual support for their claim [of unconstitutional motive] to avert dismissal." *Hobson,* 737 F.2d at 30; *see also Elliott,* 751 F.2d at 1482 (plaintiff must state "with particularity all material facts on which he contends he will establish his right to recovery, which will include detailed facts supporting the contention

19. It is not entirely clear which party bears proof burdens on the various issues subsumed within the qualified immunity inquiry. The Supreme Court may have intended to place on plaintiffs the burden of establishing that the rights at issue were "clearly established" at the time of the alleged violation. *See Davis,* 104 S.Ct. at 3021 ("A plaintiff ... may *overcome* the defendant official's qualified immunity only *by showing* that those rights were clearly established") (emphasis added). *But see Ellsberg v. Mitchell,* 709 F.2d 51, 66–69 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1316, 79 L.Ed.2d 712 (1984) (placing burden on defendant). At the same time, the Court in *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), held that qualified immunity is an affirmative defense which defendants must plead on pain of preclusion; several lower courts, citing the Supreme Court's statement in *Gomez* that "[t]he existence of a subjective belief will frequently turn on factors which a plaintiff cannot reasonably be expected to know," *id.* at 641, 100 S.Ct. at 1924, had placed on defendants the burden of proving good faith. *See Dellums v. Powell,* 566 F.2d 167, 175–76 (D.C.Cir.1967). *See generally* Gildin, The Standard of Culpability in Section 1983 and *Bivens* Actions: The Prima Facie Case, Qualified Immunity and the Constitution, 11 HOFSTRA L.REV. 557, 595–96 (1983), and cases cited therein. It may be that the most appropriate solution to the state of mind proof burden in these cases is a middle

way, *i.e.,* the initial burden of production would be cast on the defendant, while the ultimate burden of persuasion would rest with the plaintiff.

20. *See Contemporary Missions Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir. 1981) (where defendants "produced affidavits setting forth reasonable grounds for their actions and, in addition, attested that they acted in good faith ... [they] sustained their burden of demonstrating that no genuine issue of material fact existed").

A magistrate's probable cause determination, the Supreme Court has held, does not *conclusively* establish the objective reasonableness of a police officer's search or arrest. *Malley v. Briggs,* —— U.S. ——, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). As the court of appeals decision affirmed by the Supreme Court indicated, however, the magistrate's determination ordinarily should carry some weight in the immunity inquiry. *See Briggs v. Malley,* 748 F.2d 715, 721 (1st Cir.1984) (where sufficiency of facts in affidavit "fall[s] into the grey area appropriate for judicial determination," magistrate's probable cause finding "will insulate the officer from liability"); *see also id.* at 722 (magistrate's finding "might be admissible as expert evidence of [defendant's] reasonableness") (Aldrich, J., concurring); *cf. United States v. Leon,* 468 U.S. 897, 922–24 & n. 23, 104 S.Ct. 3405, 3421–22 & n. 23, 82 L.Ed.2d 677 (1984) (officer's reliance on magistrate must still be "objectively reasonable," for determination of which "all of the circumstances ... may be considered").

that the plea of immunity cannot be sustained").[21] The factual support plaintiff Martin alleged in response to defendants' motions is contained in these recitations:

—the defendants participated in a meeting on November 29, 1982, to review videotapes of the November 27 beating incident;

—plaintiff was the "only person identified and marked for prosecution solely as a result of that review";

—the defendants "worked closely with" the U.S. Attorney in deciding to arrest and prosecute plaintiff;

—an "abnormally large and complex team of officers" effected plaintiff's arrest.

Plaintiff's Opposition to Defendants' Motion for Summary Judgment at 10.

█ This enumeration is insufficient, we hold, to demonstrate the existence of a "genuine issue" as to the reasonableness and good faith of the Capitol Police. We recognize that in an ordinary case, where "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable" to the opponent of the summary judgment motion, *see United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), circumstantial evidence of this quality might allow a plaintiff to remain in court. *See Anderson,* 106 S.Ct. at 2510 (dispute over material fact is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–58, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970) (where party opposing summary judgment motion introduced evidence which would permit a jury to "infer from the circumstances" that an actionable conspiracy had taken place, moving party's "failure to foreclose" that possibility mandated denial of motion).

This is not, however, an ordinary case. While we hold that plaintiffs may present claims that depend upon proof of unconstitutional motive, we must take care not to reimpose "precisely the burden *Harlow* sought to prevent." *Hobson,* 737 F.2d at 29. Before *Harlow,* "an official's subjective good faith ha[d] been considered to be a question of fact ... inherently requiring resolution by a jury." *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737. That approach produced results "incompatible with [the Supreme Court's] admonition in *Butz* that insubstantial claims should not proceed to trial." *Id.* at 815–16, 102 S.Ct. at 2737. The Supreme Court's "strong condemnation of insubstantial suits against government officials," *Krohn v. United States,* 742 F.2d 24, 31 (1st Cir.1984), impels the application of a standard more demanding of plaintiffs when public officer defendants move for summary judgment on the basis of their qualified immunity.

█ We set out, as best as we can capture it, that more demanding standard. Where the defendant's subjective intent is an essential component of plaintiff's claim, once defendant has moved for pretrial judgment based on a showing of the objective reasonableness of his actions, then plaintiff, to avert dismissal short of trial, must come forward with something more than inferential or circumstantial support for his allegation of unconstitutional motive. That is, some direct evidence that the officials' actions were improperly motivated must be produced if the case is to proceed to trial. *See Harris,* 642 F.Supp. at 1066.

Limitations of this kind on the range of inferences a trial court may draw are not extraordinary. Where an antitrust conspiracy is alleged, for example, "mistaken inferences ... are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita*

---

**21.** Although the question came up as a pleading matter in *Hobson,* the essential inquiry remains the same whether it is posed under Fed.R.Civ.P. 12(b)(6) at the threshold of the proceedings (dismissal for failure to state a claim upon which relief can be granted), or under Fed.R.Civ.P. 50(b) at the end of the adjudication (judgment n.o.v.). The inquiry is whether there exists no genuine issue of material fact that would permit a reasonable jury to find against the moving party. *See* The Supreme Court, 1985 Term—Leading Cases, 100 Harv.L.Rev. 100, 250, 257 (1986) (comment on *Celotex* and *Anderson* ).

*Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* — U.S. —, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986); *see also Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 762–64, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984). Therefore, to survive a motion for summary judgment, a plaintiff "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita,* 106 S.Ct. at 1357, quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471; *cf. First National Bank v. Cities Service Co.,* 391 U.S. 253, 280–90, 88 S.Ct. 1575, 1588–93, 20 L.Ed.2d 569 (1968) (circumstantial evidence of conspiracy insufficient to take the case to the jury where inference of nonconspiratorial conduct equally plausible); *Smith v. Northern Michigan Hospitals, Inc.,* 703 F.2d 942, 956 (6th Cir.1983) (inference that anticompetitive conduct resulted from concerted activities and improper motive not permissible where "persuasive evidence" of legitimate purpose opposed inference); *Paul Kadair, Inc. v. Sony Corp.,* 694 F.2d 1017, 1027 (5th Cir.1983) (evidence of parallel conduct as basis for inference of conspiracy will not suffice to block summary judgment for defendant unless plaintiff comes forward with "some 'plus' factor which tends to indicate that the asserted unilateral behavior was not such in fact").

To recapitulate, plaintiff Martin's fact recitations, as they now stand, are insufficiently probative of the alleged unconstitutional motive to warrant denial of the Capitol Police officers' motion for summary judgment. Martin has indeed produced more than merely "his own subjective belief that the defendant[s] intended him

harm." *Barker v. Norman,* 651 F.2d 1107, 1127 (5th Cir.1981). The record contains no direct evidence, however, that Martin's arrest and prosecution were impermissibly designed to deter him from exercising his legal rights. Thus Martin has not overcome the objective indicia of good faith proffered by defendants.

■ We do not put down our pen yet, and mandate immediate entry of judgment for the Capitol Police officers, for the approach to pretrial development of cases such as this one was far from clear and certain when the district court made its rulings in Martin's favor. Fairness therefore requires that we afford plaintiff in the case at hand a last chance to make the showing necessary to survive defendants' summary judgment motion.[22]

Summary judgment, in the mine-run of cases, is generally inappropriate "until all discovery has been completed." *City of Rome v. United States,* 450 F.Supp. 378, 384 (D.D.C.1978), *aff'd,* 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980); *see also Grove v. Mead School District No. 354,* 753 F.2d 1528, 1532 (9th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 85, 88 L.Ed.2d 70 (1986). Reasonable opportunity for discovery, we have commented, "is particularly important where crucial facts are in the control of the opposing party." *Black Panther Party v. Smith,* 661 F.2d 1243, 1278 (D.C.Cir.1981), *vacated as moot,* 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982); *see also Hobson,* 737 F.2d at 30–31 ("in some circumstances plaintiffs are able to paint only with a very broad and speculative brush at the pre-discovery stage"). We have noted that creditable

---

**22.** Our dissenting colleague, observing that "Martin has been represented throughout by highly competent counsel," would cut Martin off at this pass, with absolutely no chance for discovery, and no opportunity thereafter to replead. *See* Dissent at 1441–42 & n.*. We fear that our colleague, from his lofty appellate perch, has overlooked litigation's exigencies. A highly competent district judge, diligently endeavoring to follow our *Hobson* precedent, allowed Martin to proceed to uncircumscribed discovery. Should Martin have objected and insisted on a more guarded ruling?

We raise here, in addition, other doubts we have about the sense and sensitivity of the dis-

senting view. If the able district judge, a prime addressee of our *Hobson* opinion, did not fully grasp our meaning, might it be that we were less clear than the dissent supposes? Might it also be that a judge-made rule emerging in one context—*e.g.,* the *Hobson* appeal, where discovery had long since been completed and where the narrow question of the permissible scope of discovery was at the periphery of the court's field of view—requires adjustment when applied in a different context? Is that not the way case law develops, through constant accretion, erosion, and correction, as judges sensibly respond to the varieties of human experiences that troop before our courts?

pleas of official immunity remove cases from the mine-run category. *See supra* p. 1435. Nonetheless, we are alert to this reality: Allowing plaintiffs to raise certain claims of unconstitutional motive could become an empty gesture were we to impose a blanket restriction on *all* discovery prior to the resolution of the qualified immunity issue on summary judgment.[23]

While leaving some space for discovery, and, thereafter, the opportunity to replead,[24] we reiterate here the necessity, underscored in recent Supreme Court decisions, to minimize the burdens imposed upon government officials:

> What is a federal trial judge to do? One thing he may not do: face it as just another lawsuit in which the notice pleading's liberal policy of F.R.Civ.P. 8 counts on pre-trial discovery to ascertain the factual basis for the claim[.] ... Allowing pretrial depositions, especially those taken adversely of the government official to ferret all of his actions and the

reasons therefor ... would defeat and frustrate the function and purpose of the ... immunity[.] ... [U]se of liberal discovery to establish the basis of a claim is directly at odds with the Court's direction in *Harlow* that government officials entitled to immunity be freed from the burdens, the stress, the anxieties and the diversions of pretrial preparations.

*Elliott*, 751 F.2d at 1479 (footnotes omitted); *see also Morrison*, 761 F.2d at 244 ("liberal notions of notice pleading must ultimately give way to immunity doctrines that protect us from having the work of our public officials dulled or disrupted by participation in ... the pretrial development of civil lawsuits"). To balance these concerns properly, district courts will need to employ with particular care and sensibility their large authority to exercise control over discovery. *See* FED.R.CIV.P. 26(b); 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE and PROCEDURE § 2036 at 267–68 (1970).

The Federal Rules permit the district judge to defer decision on a summary judg-

---

**23.** *Harlow* directed that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed." 457 U.S. at 818. The post-*Harlow Mitchell* decision, however, indicates the Court's awareness that some opportunity for discovery may be necessary for the just resolution of the threshold question. *See Mitchell*, 105 S.Ct. at 2815–16 ("*Harlow* emphasizes that even such pretrial matters as discovery are to be avoided *if possible* [.] ... Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment *if discovery fails to uncover evidence* sufficient to create a genuine issue as to whether the defendant in fact committed those acts.") (emphasis added).

In two recent cases, we applied the *Hobson* pleading standard to deny plaintiffs an opportunity to conduct further discovery where they had failed to set forth "nonconclusory allegations of evidence of [unconstitutional] intent" in their complaints. *Smith v. Nixon*, 807 F.2d 197, 200 (D.C.Cir.1986), *quoting Hobson v. Wilson*, 737 F.2d 1, 29 (D.C.Cir.1984); *Ellsberg v. Mitchell*, 807 F.2d 204, 207 (D.C.Cir.1986). In the *Smith* and *Ellsberg* cases, the defendants had asserted a national security justification for their allegedly unlawful conduct, and we held that their entitlement to qualified immunity turned exclusively on the "objective reasonableness" of their actions. *Smith*, 807 F.2d at 200–201; *Ellsberg*, 807 F.2d 207; *see Halperin v. Kissinger*, 807 F.2d 180, 185–88 (D.C.Cir.1986).

In contrast, the instant defendants' qualified immunity claims can be defeated by direct evidence of their subjective intent—evidence which, as noted above, is now in the defendants' sole possession. We may, without undermining *Smith* and *Ellsberg*, permit sharply limited discovery in the present context so as to avoid "overly rigid application" of the *Hobson* pleading rule. *Hobson*, 737 F.2d at 31.

**24.** The Dissent would disallow this last chance; our colleague "would take *Hobson* to mean what [he] says [it means] and move on to the next case." Dissent at 8. There may be no next case under the Dissent's analysis, however.

Our colleague reads *Hobson* with the rigidity *Hobson's* author cautioned against. *See Hobson*, 737 F.2d at 30–31. The Dissent appears to insist on an invulnerable complaint at the outset, despite the instruction of the Federal Rules that "leave [to amend] shall be freely given [at any time] when justice so requires." FED.R.CIV.P. 15(a). Similarly, the Dissent seemingly rules out entirely the rule that summary judgment may be deferred pending a discovery opportunity for the opponent of peremptory dismissal. *See* FED.R.CIV.P. 56(f). A "get-Martin" scheme, if one existed, could be brought to light, the Dissent apparently would allow, only in the unlikely event that a police officer volunteered the information, or the equally unlikely happenstance that an eavesdropper heard and reported what the officers said. *Cf.* Vaise v. Delaval, 1 Term Rep. 11, 99 Eng.Rep. 944 (K.B. 1785).

ment application to permit the opponent of the motion to obtain affidavits, take depositions or pursue other discovery. FED.R. CIV.P. 56(f).[25] The Rules also instruct district judges to allow pleading amendments "freely" and at any time "when justice so requires." FED.R.CIV.P. 15(a). Those Rules could be utilized here, with limitations appropriate "to ensure that [the defendants will not be subjected to] unnecessary involvement in further litigation." *Black Panther Party*, 661 F.2d at 1278. Thus, the district court could permit particularized interrogation of the defendants for the circumscribed purpose of ascertaining whether there is any substance to Martin's assertions concerning when and why the municipal and federal officers decided to arrest and prosecute him. Martin asserts that the decision to pursue him was made at the November 29, 1982 meeting at which MPD and Capitol Police officers reviewed videotapes of November 27 Klan march day events. *See supra* pp. 1434–35. His interrogatories or questions on deposition, accordingly, should focus precisely on the participants in, and what occurred at, the November 29 session.

Ultimately, when summary judgment for defendants on Martin's constitutional tort claims is reconsidered, the district judge should recall that Martin may not take his case to the jury simply because defendants' state of mind is at issue and jurors might disbelieve defendants' testimony. *See Anderson*, 106 S.Ct. at 2514; *cf. Dyer v. MacDougall*, 201 F.2d 265 (2d Cir.1952) (L. Hand for the court; J. Frank dissenting). At that point, Martin will have only one way to remain in court under *Hobson*. If, after the limited discovery we have specified, he has not presented an amended complaint containing "nonconclusory allegations of evidence of [unconstitutional] in-

tent," *see Hobson*, 737 F.2d at 29, his constitutional tort claims must be dismissed.

## CONCLUSION

While we part company with the district court in this case, we recognize that the Supreme Court precedent with which we deal in this opinion is still evolving, may be variously interpreted, and sometimes slips from the grasp of lower court (and therefore fallible) judges in the courts of appeals and district courts.[26]

For the reasons stated in the opinion, we vacate the orders on review and instruct on remand (1) dismissal of the common law tort claims asserted against the Capitol Police officers, because those officers possess absolute immunity from suit on those claims; (2) deferral of decision on defendants' request for summary judgment on the constitutional tort claims alleged in the complaint, pending (a) plaintiff's pursuit of discovery, limited in the manner indicated in this opinion, and (b) an opportunity for plaintiff's prompt presentation thereafter of an amended complaint meeting the standard set out in *Hobson*, 737 F.2d at 29.

*Orders vacated and case remanded to the district court for proceedings consistent with this opinion.*

HARRY T. EDWARDS, Circuit Judge, concurring:

I concur fully in Judge Ginsburg's thoughtful opinion, including her reading of this court's decision in *Hobson v. Wilson*, 737 F.2d 1 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Contrary to the protestations of our dissenting colleague, the majority opinion is not unfaithful to the teachings of *Hobson*. The majority opinion merely instructs the district court to permit carefully circumscribed discovery focused precise-

---

**25.** The Rule reads:

> **When Affidavits are Unavailable.** Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery

to be had or may make such other order as is just.

**26.** *Cf. Brown v. Allen*, 344 U.S. 443, 540, 73 S.Ct. 397, 97 L.Ed. 469 (1952) (Jackson, J., concurring) (Supreme Court is "not final because [it is] infallible, but ... infallible only because [it is] final").

ly on the events of the November 29, 1982 meeting. Allowing such limited discovery in this context is fully consistent with our position in *Hobson* that plaintiffs who are unable to allege specific facts to support a claim of unconstitutional motive should not be permitted to involve government actors in "protracted" discovery and trial. 737 F.2d at 30. It is also fully consistent with this court's twin goals in *Hobson:* to limit the litigation burdens placed on government officials by "insubstantial" lawsuits, while preserving the opportunity for plaintiffs to vindicate constitutional rights. *Id.* at 29–31. After sharply limited discovery, Martin will be required to allege nonconclusory evidence of unconstitutional intent; if he is unable to sustain this burden, the district court will be required to dismiss his claim, thereby precluding burdensome, protracted discovery and trial. *Hobson,* which emphasized the need to maintain some flexibility in this context, certainly does not require that we completely foreclose Martin from pursuing a potentially meritorious constitutional claim.

STARR, Circuit Judge, concurring in part and dissenting in part:

I concur fully in Sections I and II of the majority opinion. I also agree with much of Section III, which ably treats the difficult issue of the defendants' qualified immunity from Martin's constitutional claims. Notwithstanding these important areas of agreement, I am obliged to part company from the majority with respect to its reading of our decision in *Hobson v. Wilson,* 737 F.2d 1 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), and the majority's assessment of Martin's complaint which flows from this discussion. Because *Hobson* meant what it so plainly said and Martin's complaint presents nothing more than conclusory allegations of improper motive, I respectfully dissent from that portion of the judgment elucidated in Section III.

I

As is evident from this circuit's recent opinions on the subject, vexing and sensi-

tive questions are posed by application of the "objective reasonableness" immunity test of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), to claims premised on a government official's motive or purpose. *See, e.g., Halperin v. Kissinger,* 807 F.2d 180 (D.C.Cir.1986); *Smith v. Nixon,* 807 F.2d 197 (D.C.Cir. 1986). The issue basically calls upon us to balance *Harlow*'s focus on the need expeditiously to dispose of "insubstantial" lawsuits with the preservation of avenues for judicial vindication of constitutional rights.

This circuit's most definitive attempt to date to strike the proper balance is *Hobson v. Wilson.* In my view, the majority opinion's handling of *Hobson* is at best grudging and at worst a regrettable failure to adhere to binding precedent. Our opinion in *Hobson* contained a separate section entitled, "Pleading Unconstitutional Motive," which dealt explicitly with the precise issue in this case. The majority here rightly draws from *Hobson* a requirement that "plaintiffs must 'produce some factual support for their claim [of unconstitutional motive] to avert dismissal.'" Majority Opinion at 1434 (quoting *Hobson,* 737 F.2d at 30). But that is by no means all that *Hobson* required. Our opinion in that case also established pleading requirements that the majority, for reasons that are enshrouded in mystery, simply refuses to recognize.

In *Hobson,* the court carefully noted the potential circumvention of *Harlow* that could be worked through an allegation of unconstitutional motive:

We recognize that in some instances, plaintiffs might allege facts demonstrating that defendants have acted lawfully, append a claim that they did so with an unconstitutional motive, and as a consequence usher defendants into discovery, and perhaps trial, with no hope of success on the merits. The result would be precisely the burden *Harlow* sought to prevent.

737 F.2d at 29. Animated by this concern, the *Hobson* court went on to strike a careful balance between the competing interests in this difficult area. To prevent the

easy evisceration of *Harlow* that "unconstitutional motive" cases make possible, *Hobson* determined that the pleading requirements must be carefully drawn in such cases, and, in a passage of critical—I believe controlling—importance to the case at hand, the court undertook to set out a more exacting pleading requirement:

> Accordingly, in cases involving a claim that defendants acted with an unconstitutional motive, *we will require that nonconclusory allegations of evidence of such intent must be present in a complaint* for litigants to proceed to discovery on the claim.

*Id.* (emphasis added).

As if that statement were not enough, *Hobson* went on to quote with approval the Second Circuit's standard: " '[C]omplaints containing only "conclusory," "vague," or "general allegations" of a conspiracy to deprive a person of constitutional rights will be dismissed.' " *Id.* at 30 (quoting *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir.1977)). How this could be plainer I, for one, do not know. Perhaps we could have added, "And we really mean it," to allay any concerns that ambiguity might nonetheless infect our admirably clear language. *Cf. Young v. Community Nutrition Institute*, —— U.S. ——, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986). Yet, the majority's analysis omits this pivotal teaching of *Hobson: the complaint itself must include "nonconclusory allegations of evidence of [unconstitutional] intent."* 737 F.2d at 29 (emphasis added).

*Hobson* was, after all, a lengthy, careful, and well-reasoned opinion. And it cannot be gainsaid that this heightened pleading requirement was central to the delicate balance *Hobson* struck. Even if one has latter-day doubts as to *Hobson*'s wisdom, the pleading requirement which it so clearly articulates is the law of this circuit. We are bound to follow it. Indeed, just recently we did not hesitate to apply *Hobson* in other cases of no little moment. *See, e.g., Smith v. Nixon*, 807 F.2d 197, 200–01 (D.C. Cir.1986). Yet, this carefully-drawn standard, crafted with the strictures of *Harlow* in mind, is entirely ignored by the majority.

In my view, if *Hobson* were conscientiously applied to this case, Martin's complaint would plainly fail. It contains nothing that could be construed, even under the most charitable view, as a "nonconclusory allegation of evidence of [unconstitutional] intent," *Hobson*, 737 F.2d at 29. To the contrary, the complaint alleged in classically vague and conclusory fashion:

> As a result of public and media attention to the unprovoked attack on plaintiff, defendants conspired to develop an unlawful scheme to deflect attention from their actions and to deter plaintiff from seeking to vindicate the violation of his rights.

First Amended Complaint, ¶ 18, J.A. at 26, 31. This broadside is scarcely the stuff of "nonconclusory allegations."

The majority appears to divine a sufficiently nonconclusory allegation in Martin's reference to a meeting of law enforcement officials on November 29, 1982. *See* Majority Opinion at 1434–35, 1437–38. But there is a problem. Nothing of this November 29 conclave appears in Martin's complaint. He apparently proceeded in utter ignorance of this now-crucial meeting, where the alleged "get-Martin" scheme was hatched, until the Government's summary judgment motion, which was supported by an affidavit describing the meeting. Indeed, Martin's only invocation of the November 29 meeting is in his opposition to summary judgment, where he merely asserts that he was the only person identified for prosecution as a result of that meeting. *See* Plaintiff's Opposition to Federal Defendants' Motion for Summary Judgment, Docket Entry 113, at 10; *see also* Majority Opinion at 1434–35 (referencing this filing as Martin's factual support for his claims). In my view, the majority properly concludes that this enumeration is "insufficient" to create a genuine issue, Majority Opinion at 1435, but then in the next breath the majority permits Martin's claim to go forward to discovery. Fairly and dispassionately viewed, Martin's "factual" enumeration is similarly an "insufficient" "nonconclusory allegation" to withstand *Hobson's* threshold test, even overlooking for the moment

that it comes too late in the litigation process. *Cf. Hobson*, 737 F.2d at 29 (allegations "must be present in a complaint"). Only if one evades—or discards—the language of *Hobson* to which I have referred can Martin's complaint survive. Accordingly, I pause briefly to examine *Hobson* for possible qualifications of the "nonconclusory allegations" requirement that would justify jettisoning what was, until today, quite clear.

## II

Two passages in *Hobson* could perhaps be employed to water down the opinion's direct requirement. In my view, however, neither does service as a justification for the majority's decision.

First, immediately after setting forth the "nonconclusory allegations" requirement, the opinion notes that

> [t]he allegations on this [unconstitutional motive] issue need not be extensive, but they will have to be sufficiently precise to put defendants on notice of the nature of the claim and enable them to prepare a response and, where appropriate, a summary judgment motion on qualified immunity grounds.

737 F.2d at 29. While this language could be taken to suggest the appropriateness of a forgiving approach, it obviously cannot be read to reduce the "nonconclusory allegations" requirement to a nullity. This is what the majority does, however, by permitting Martin to go forward. Far from being extensive, Martin's "nonconclusory allegations" are non-existent. He alleges *no* specific facts. Instead, he employs the tactic of which *Hobson* clearly warned, namely "pleading that [an] act was performed with an intent to violate clearly established constitutional rights and thereby surmounting the threshold test set out in *Harlow*." *Id.*

Second, toward the end of the "Pleading Unconstitutional Motive" section, the *Hobson* court wrote:

> In so holding we do not forget that in some circumstances plaintiffs are able to paint only with a very broad and speculative brush at the pre-discovery stage, and

that overly rigid application of the rule we articulate could lead to dismissal of meritorious claims.

*Id.* at 30–31. This passage, apart from suggesting that the *Hobson* court certainly thought it was espousing a "rule," suggests that the shortcomings of Martin's complaint should be overlooked if he was merely painting "with a very broad and speculative brush." This does not, however, forgive him from even painting. Martin fails to allege even broad or speculative "facts" regarding the defendants' conduct, offering instead only the bald assertion that the "defendants conspired to develop an unlawful scheme." This brush is broad indeed, and not at all what *Hobson* had in mind. Otherwise, the *Hobson* "exception" would swallow the rule or be so broad and ill-defined so as to drain the "rule" of any meaning. Moreover, the sentence immediately following this picturesque "painting" language sets forth the following conclusion:

> Thus, while we hasten to add that district court judges must act cautiously in this regard, *and freely give leave to amend an inadequate complaint,* we conclude that *Harlow* requires that merely conclusory allegations of unconstitutional motive, devoid of factual support, must be found lacking and be dismissed.

*Id.* at 31 (emphasis added). It therefore appears to me that even if we forgive the inadequacies of Martin's complaint as due to his being forced to "paint" broadly and speculatively, the proper remedy would be to grant leave for Martin to amend his complaint, not to expose government officials at this stage to the intrusive processes of discovery.

Thus, I find nothing in *Hobson* to undercut the pleading requirements which I should have thought were established beyond peradventure. My view is straightforward. I take *Hobson* to mean what it twice says: "merely conclusory allegations of unconstitutional motive, devoid of factual support, must be found lacking and dismissed." *Id.; see also id.* at 29 ("nonconclusory allegations ... must be present in a complaint").

### III

*Hobson* set forth a clear standard and outlined how it might typically be applied. The parties in this litigation had ample benefit of our teaching in that case; the opinion issued on June 8, 1984 and Martin's complaint was filed on February 21, 1985.* But while the Government has followed *Hobson*'s guidelines, Martin has not. Specifically, after noting that the Second Circuit's test from *Ostrer* was "more than adequate to address the *Harlow* concerns," *see supra* pp. 1426–27, the *Hobson* court continued:

> We simply remind our trial courts that some factual allegations must support claims of unconstitutional motive. Plaintiffs who fail to allege any specific facts to support a claim of unconstitutional motive cannot expect to involve Government actors in protracted discovery and trial. On receipt of such a complaint, Government defendants might move for dismissal or, alternatively, for summary judgment. Then plaintiffs must produce some factual support for their claim to avert dismissal.

*Id.* at 30. This is precisely the course that the Government has followed. After receipt of Martin's complaint, the Government moved for summary judgment. While the complaint should have been dismissed as an initial matter due to Martin's failure to include "nonconclusory allegations" of "specific facts," granting a re-

mand to permit discovery is even more outlandish in the posture of this case.

Martin has had ample opportunity to bring to the court's attention any information he possesses regarding the unconstitutional motive that allegedly infected the law enforcement officials' decision to arrest and prosecute him. He has displayed that he has no such "specific facts." Yet, the majority allows Martin to latch onto a fact set forth in the Government's summary judgment motion to carry him into discovery. This is court-sanctioned sandbagging in the extreme.

In sum, the majority's failure to adhere to applicable precedents, both from the Supreme Court and this circuit, adds confusion where clarity is needed, subjects government officials to needless and time-consuming discovery, and permits future plaintiffs to avoid *Harlow*'s application with a mere conclusory allegation of unconstitutional motive. Claims such as Martin's should not be allowed to proceed to discovery. Rather, as the precedents direct, they should be dismissed. I would take *Hobson* to mean what it says and move on to the next case.

---

* This case does not involve a *pro se* litigant, a situation where a pleading requirement such as this might be less stringently applied consistent with other rules governing the interpretation of *pro se* complaints. *See, e.g., Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Mr. Martin has been represented throughout by highly competent counsel.